## ERIE R. CO. v. DOWNS.

### (Circuit Court of Appeals, Second Circuit. April 10, 1918.)

### No. 207.

1. COMMERCE ⬥27(7)—EMPLOYERS' LIABILITY ACT—EMPLOYMENT IN "INTERSTATE COMMERCE."

A switchyard brakeman was a member of a crew attached to a switch engine, and his day's work was in switching cars in interstate and intrastate commerce. He had just assisted in switching a string of 50 or 60 cars, some of which were loaded with interstate shipments, and was returning to his engine when he was struck and injured. *Held*, that his return was so immediately connected with his previous act as to be a necessary incident thereto, and that he was at the time of his injury employed in interstate commerce, within the meaning of Employers' Liability Act April 22, 1908, c. 149, § 1, 35 Stat. 65 (Comp. St. 1916, § 8657).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. MASTER AND SERVANT ⬥278(18), 289(29)—ACTION FOR INJURY TO SERVANT —NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE.

Plaintiff, who was a brakeman in defendant's switchyard, in the course of duty, and when it was dark, or nearly so, started to pass through a space of 15 or 20 feet between cars standing on a track, when a single car at one side was struck with great force by another, and plaintiff was overrun and injured. The moving car had been cut out and allowed to run down quite a steep grade, with no light and no brakeman upon it to control its speed. This was not in accordance with the rules or custom of the yard. In the usual course employés were crossing the tracks at all times, and this was known to defendant. *Held*, that there was evidence to sustain a finding of defendant's negligence, and also that it could not be said, as matter of law, that plaintiff was chargeable with contributory negligence.

3. TRIAL ⬥350(6)—SPECIAL ISSUES—INSTRUCTIONS—ASSUMED RISK.

Where the court, in an action by an employé to recover for an injury, instructed the jury fully and correctly on the issue of assumption of risk, and that, if they found that plaintiff had assumed the risk, he could not recover, it was not reversible error to refuse to submit such issue by a special question.

In Error to the District Court of the United States for the Southern District of New York.

Action at law by John Downs against the Erie Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Certiorari denied 38 Sup. Ct. 583, 247 U. S. ——, 62 L. Ed. ——.

The plaintiff in error will be hereinafter referred to as defendant, and the defendant in error as plaintiff. The plaintiff is a citizen of New Jersey. The defendant is a corporation organized and existing under the laws of the state of New York. The plaintiff brought an action under the federal Employers' Liability Act to recover damages for personal injuries sustained by him while in the employ of defendant. He obtained a verdict from a jury for $22,500, which the trial court reduced to $20,000.

The plaintiff was a yard brakeman, and was struck down and run over by a car in the defendant's yard at Jersey City, as a result of which he lost his right arm. It is claimed the accident occurred by reason of the defendant permitting cars to move about its yard while it was dark, without providing lights on the cars or brakemen to control the movement of the cars or to warn of their approach. The plaintiff had been employed in the yards for 19

years. Thé yard was divided into various subyards, and the accident occurred in what is known as "Yard A," and the cars in that yard are sent over what is called the North Hump." This hump is 10 feet high, and it descends sharply for a distance of 300 feet at a grade of 3.8, and then tapers gradually for about 500 feet to a level grade. The cars come from a receiving yard (yard D) into yard A, which is a classification yard, and as they reach the top of the hump they are cut off in "cuts" of from 1 to 20 cars, and are permitted to roll down the hump by gravity into some one of the 21 tracks· which that yard contains, where they are made up into trains for different points.

The plaintiff had served as brakeman, conductor, and yardmaster. On the day in question he was serving as a freight brakeman in a crew engaged in switching cars. He testified that just previous to the injury he had been engaged with his engine in an operation consisting of moving about 50 or 60 cars from yard A into yard E, and was protecting the rear end of the string of cars so moved. That operation being concluded, he left that string of cars to return and· pick up his engine in yard A; the engine being about 50 cars away from him. To regain his engine he had to cross a number of tracks, and as he approached the track on which he was injured he looked, he said, to the east and to the west. He saw a car standing to the east and some to the west, with an open space of 15 or 18 feet between. He could see nothing coming on the track from either direction and started to cross. As he took one step beyond the first rail he heard a crash, and was knocked down and run over. A car had come down the hump[1] and crashed into the stationary car, which knocked him down and ran over him. The force of the impact was such as to drive the car collided with over 90 feet, even against the resistance afforded by the weight of the cars standing 9 or 10 feet to the west of the plaintiff. There was no one on the colliding car at the time to control its speed or give warning. The practice was for the conductor in charge of a switching crew to have brakemen varying in number mount the cars as they were cut off at the top of the hump and ride them down the hump into the classification tracks, so as to control their speed and that no damage would be done. It sometimes happened, even at night, that a conductor would drop 2 or 3 empty cars down the hump, without a brakeman in charge and without lights, when he knew that there was a long, clear space on the track along which the cars could run gradually until they came to a stop.

The accident happened on November 23, 1916, a little after 5 o'clock in the afternoon. It was raining and getting dark, and the plaintiff and the other members of his crew had their lamps lighted.

Stetson, Jennings & Russell, of New York City (William C. Cannon, R. L. Von Bernuth, and Coulter D. Young, all of New York City, of counsel), for plaintiff in error.

Sydney A. Syme, of Mt. Vernon, N. Y., for defendant in error.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

ROGERS, Circuit Judge (after stating the facts as above). [1] Inasmuch as the action has been brought under the federal Employers' Liability Act, the first question to be determined is whether at the time of his injury the plaintiff was actually engaged in interstate commerce. If he were not so engaged, we need not inquire further. To maintain the action it must appear that at the time of the injury he was employed in moving or handling cars engaged in interstate commerce, or performing an act so directly and immediately connected

---

[1] There was no direct evidence in the case as to where the colliding car came from. The circumstances indicate quite conclusively, however, that it came from the hump.

with the act of moving or handling such cars as to be a part of it or a necessary incident thereto. From what has already been said, it is apparent that he had been engaged in shifting a string of cars from yard A to yard E. It is conceded that some of the cars in that string were engaged in interstate commerce. Some of the cars contained freight transported from other states into the state of New Jersey, and some of the cars contained freight which was being transported from the state of New Jersey to other states, and remaining cars contained freight which was being transported between points wholly within the state of New Jersey; and it was stipulated that the next switching movement, subsequent to the occurrence of the accident, which was made by the switch engine and switching crew to which plaintiff belonged, consisted in moving three cars containing coal which had been transported from the state of Pennsylvania into the state of New Jersey.

The defendant insists that the plaintiff had completed the switching operation he had been engaged in, and was injured while on the way back to receive orders which would require the beginning of a new operation. On the other hand, the plaintiff argues that the engagement was not completed until he had rejoined his engine, and that his walking back for that purpose was necessarily the final act in the operation first engaged in. The defendant relies upon Erie Railroad Company v. Welsh, 242 U. S. 303, 37 Sup. Ct. 116, 61 L. Ed. 319, and insists that the facts in that case are similar to those in this. In that case the plaintiff was, and for some time had been, a yard conductor, engaged in miscellaneous services in the way of switching and breaking up and making trains under the orders of the yardmaster, and had to apply frequently to the latter for such orders. On the night of the accident the plaintiff, with a yard crew, took a freight car loaded with merchandise destined to a point without the state into the classification yard, and placed it on a siding, where it was left, then proceeded a short distance further with an intrastate caboose, and left it on a different track, then took the engine to a water plug and took on water, and started back with the engine to the yard from which it originally came, slowing down on the way near the yardmaster's office, where the plaintiff jumped off to get further orders. In jumping, his feet became entangled in signal wires, and he was thrown under the engine and injured. It appeared that the orders he would have received, had he not been injured on his way to the yardmaster's office, would have required him immediately to have made up an interstate train. The court held that he could not maintain his action, as he was not at the time engaged in interstate commerce.

We do not, however, agree that the facts in that case are so similar to the facts in this case that the decision in that must be regarded as decisive in this. There were three distinct acts involved in that case. The first was an act in interstate commerce. The second was in intrastate commerce. The third act of taking on water may be disregarded as being preparatory to whatever work might next be engaged in. The act of intrastate commerce intervened between the act of interstate commerce and the injury. The Supreme Court of Ohio had

held that the plaintiff was not at the time of the injury employed in interstate commerce. The case was taken to the Supreme Court of the United States. The court said:

"The question remains whether he was performing an act so directly and immediately connected with his previous act * * * as to be a part of it or a necessary incident thereto. * * * And this depends upon whether the series of acts that he had last performed was properly to be regarded as a succession of separate tasks or as a single and indivisible task."

The court held that it could not say that the Ohio courts had committed manifest error and affirmed the judgment. The case is clearly distinguishable from the one under consideration, for here the act prior to the injury was an act of switching cars engaged in interstate commerce; and in returning therefrom to the engine his act was so immediately connected with his previous act as to be a necessary incident thereto.

In Erie Railroad Company v. Winfield, 244 U. S. 170, 37 Sup. Ct. 556, 61 L. Ed. 1057, the action was brought to recover for the death of an employé in charge of a switch engine in the carrier's yard. In concluding his work for the day, the employé took his engine to the place where it was to remain for the night and started to leave the yard. His route lay across some of the tracks, and while passing over one he was struck by an engine, and soon died from the injuries received. Some of the cars switched during the day were engaged in interstate commerce, and others in intrastate commerce. The court held that in leaving the carrier's yard at the close of his day's work the deceased was but discharging a duty of his employment. It was a necessary incident of his day's work, and—

"no more an incident of one part than of another. His day's work was in both interstate and intrastate commerce, and so, when he was leaving the yard at the time of the injury, his employment was in both. That he was employed in interstate commerce is therefore plain, and that his employment also extended to intrastate commerce is for present purposes of no importance."

In the case now under consideration the plaintiff was a member of a crew attached to a switch engine, and his day's work was in switching cars in interstate and intrastate commerce. He had just switched a string of 50 or 60, all on the same string, and some of the cars transported freight which came from other states into the state of New Jersey, and others freight which was being transported out of the state into other states, and still other cars contained freight which was being transported between places wholly within the state of New Jersey. The plaintiff had not concluded his day's work, and was not leaving the yard, but was crossing the tracks to rejoin his engine, to continue his work. This crossing of the tracks was as much a necessary incident of the operation of switching the cars above referred to as the crossing of the tracks was an incident of the employment in interstate commerce in the Winfield Case. And in North Carolina Railroad Company v. Zachary, 232 U. S. 248, 34 Sup. Ct. 305, 58 L. Ed. 591, Ann. Cas. 1914C, 159, the plaintiff was permitted to recover under the federal Employers' Liability Act for the death of a locomotive fireman who was killed in crossing the tracks in the railroad yard

in going from his engine to his boarding house. He had inspected and oiled and fired his engine, and no cars had been attached to it when he started to go to his boarding house. The court said:

"It seems to us clear that the man was still 'on duty,' and employed in commerce, notwithstanding his temporary absence from the locomotive engine."

[2] There can be no question that this record discloses evidence which, if believed, fully justified the conclusion that the defendant was negligent. The evidence shows that defendant's employés, in their work in the yard where this accident occurred, constantly crossed the tracks, and that that practice was perfectly well known to all persons engaged in operating trains; and it was left to the jury to say whether defendant was conducting its business with ordinary care and prudence, if, with knowledge of this practice, it sent the car or set of cars down from the hump the night in question without any lanterns or lights, and allowed them to come into collision with the stationary car that was standing on the track, pushing it a considerable distance, and causing the injury complained of herein. It was usual to send a brakeman on the cars, to control their speed and prevent their striking other cars with force. The record discloses that, if cars were permitted to come down with a strong impact in such a manner as to do damage to the rolling stock, those in charge of such a car or set of cars would be subjected to punishment at the hands of the defendant. This indicated what the defendant itself regarded as the manner in which its employés should conduct these operations.

The theory of the plaintiff was that from the practice in the yard he had no reason to expect that any car or string of cars would be let loose from the hump at a high rate of speed without a light or without a brakeman to prevent a severe impact, when there was a car or set of cars anywhere on the track into which the car or set of cars were set loose; that that was a kind of risk that he had not assumed, and that from the manner in which the business in that yard had gone on for many years he had no reasonable cause to believe that what took place would occur. The defendant insisted that there were occasions when cars came down without a brakeman and were let loose so that a severe impact would occur, and that it was to be regarded as an ordinary risk which the man assumed.

[3] The jury was instructed at length concerning the assumption of risk and that the plaintiff assumed the ordinary risks inherent in his employment. The jury was informed that, when a man enters an employment, he assumes all the danger that comes from and only from the ordinary risks inherent in the character and nature of that employment, but that he does not assume the extraordinary risks. The rule on that subject as laid down by the Supreme Court in Chesapeake & Ohio Railway Company v. De Atley, 241 U. S. 315, 36 Sup. Ct. 564, 60 L. Ed. 1016, was read to the jury, and their attention was called at length to the theory of both plaintiff and defendant on this branch of the case. They were instructed that the obligation was upon the defendant to satisfy them by a fair preponderance of evidence that the plaintiff assumed the risk. "If they

satisfy you that he did," the judge instructed, "they must have the verdict. If they fail to satisfy you, Downs must have the verdict." The jury could not have failed to understand the law on that subject.

But it seems that the court submitted to the jury six written questions upon which to find special verdicts. In brief they were:

Was defendant guilty of negligence?

Was plaintiff guilty of contributory negligence?

If you find for the plaintiff, what are the full damages?

If you find plaintiff guilty of contributory negligence, what proportion of the full damage should be excluded from recovery?

If you find that defendant was guilty of negligence, and plaintiff was guilty of contributory negligence, by how much in money have you reduced the verdict against the defendant?

State whether your verdict is for plaintiff or defendant, and, if for plaintiff, then for what amount.

There was no special question submitted as to whether the accident happened as a result of one of the risks which defendant claimed that the plaintiff assumed. If the plaintiff had assumed the risk, that fact constituted an absolute defense. The defendant claims that by not including the question as to whether plaintiff had assumed the risk in the number of questions upon which the court required a special finding it in effect withdrew from the consideration of the jury that question. Counsel for defendant expressly requested the submission of a special question on assumed risks. The court said: "I decline to send that as a special question to the jury." Counsel took an exception. The court then said: "That they will take care of in their general verdict." We are not prepared to say that this constituted reversible error, as the jury had been fully instructed on that subject, and must have understood perfectly that, if plaintiff assumed the risk, he could not recover.

The defendant asserts that the plaintiff was guilty of contributory negligence as a matter of law. The federal Employers' Liability Act has changed the law of common carriers by railroad as respects the effect of contributory negligence. That act abolished contributory negligence as a defense, and it now merely diminishes the damages. Act April 22, 1908, c. 149, § 3, declares that:

"The fact that the employé may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé." United States Compiled Statutes (1916) Annotated, vol. 8, § 8659.

The jury was correctly instructed on this subject, and charged to make special findings regarding it. They were to answer specifically: "Was plaintiff guilty of contributory negligence?" If they answered that question in the negative, they were to state: "What are the full damages?" Then, if they found he was guilty of contributory negligence, they were to state: "What proportion of the full damage should be excluded from recovery?" "If you should say that he was guilty of contributory negligence, then you must make up your minds whether it was half his fault or one-third his fault, or one-tenth his fault, or whatever you believe, and you put down one-half or one-third or one-tenth or whatever it is." And then they were told that, if they found

defendant guilty of negligence and plaintiff guilty of contributory negligence, they were to state: "By how much in money have you reduced the verdict against the defendant?" The jury answered "No" to the question, "Was the plaintiff guilty of contributory negligence?" This court is unable to say as matter of law that the plaintiff was guilty of contributory negligence.

According to the defendant, if the plaintiff's testimony is true, the car which crashed into the stationary car must have been within the sight of the plaintiff, and he should have seen it had he looked with proper care and vision. The plaintiff's testimony was that he could see 4 or 5 or 6 car lengths, and that the cars were on an average 36-foot cars. That would make the distance somewhere between 144 and 216 feet, instead of 310 feet, as defendant contends. The distance from the top of the hump to the place of the accident was not less than 1,230 feet, instead of 1,000 feet, as claimed by defendant. There is no basis, therefore, for the defendant's statement that:

"If the plaintiff's testimony is true, then the car, which was more than 310 feet away from the place of the accident, while plaintiff was only 10 feet away therefrom, must have been traveling without an engine attached, at the rate of 93 miles an hour, in order to have reached the point of accident at the time the plaintiff did, and must have covered the distance from the top of the hump to the place of the accident, which was 1,000 feet in 7.33 seconds."

The plaintiff, on the other hand, asserts that, if there be substituted the actual evidence in the case in place of the defendant's assumptions, it will be found that the speed of the car did not need to be more than 19 miles an hour to place it beyond the range of his vision when he last looked, and that a car traveling at the rate of 19 miles an hour would make the trip from the top of the hump to the place of the accident in 45 seconds. We are satisfied upon looking into the evidence that it is not of such compelling character as would justify us in holding as matter of law that the plaintiff's negligence contributed to his injury.

Judgment affirmed.